1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ABELARDO SOTO,

11            Plaintiff,                    No. CIV S-05-0871 EFB P

12        vs.

13   DR. NADIUM KHOURY, et al.,
                                           ORDER
14            Defendants.

15   _____/

16        Plaintiff is a prisoner without counsel suing for alleged civil rights violations.  *See* 42

17   U.S.C. § 1983.  His May 3, 2005, complaint alleges that defendants violated his constitutional

18   rights by delaying surgery to remove a transplanted kidney, which his body was rejecting.  The

19   matter is before the court on the motion of all defendants for summary judgment.  *See* Fed. R.

20   Civ. P. 56.

21   **I.     Facts**[1]

22        Plaintiff is a state prisoner presently incarcerated at the California State Prison, Corcoran.

23   Plaintiff's Verified Complaint ("Compl."), p. 3.  The allegations of his complaint concern the

24   conduct of the defendants, all physicians, at the California Medical Facility in Vacaville,

25   _____

26        [1] Unless otherwise noted, all facts contained herein are undisputed by the parties.

                                          1

1  California.  Defendants are licensed medical doctors currently working for the California

2  Department of Corrections and Rehabilitation in administrative capacities.  Defs.' Mot. for

3  Summ. J., Decl. in Supp. Thereof, Andreasen Declaration ("Andreasen. Decl."), ¶ 2; Bick

4  Declaration ("Bick Decl."), ¶ 2; Khoury Declaration ("Khoury Decl."), ¶ 2.

5       Defendant Khoury is a medical doctor licensed with the Medical Board of California

6  since July of 1981.  Khoury Decl., ¶¶1-4.  He is employed by the California Department of

7  Corrections & Rehabilitation ("CDCR"), at the California Medical Facility ("CMF"), located in

8  Vacaville, California, as Chief Deputy of Clinical Services.  Id.  Defendant Khoury works in an

9  administrative capacity, and as part of his duties reviews 602 forms, i.e., appeals and grievances

10  prepared by inmates.  Id.  Dr. Khoury does not examine patients, and has never examined

11  plaintiff.  Khoury Decl., ¶ 2.

12       Defendant Andreason, a medical doctor licensed with the Medical Board of California

13  since June of 1992, is employed by the California Department of Corrections & Rehabilitation at

14  the California Medical Facility, as a Chief Medical Officer.  Andreasen Decl., ¶¶ 1 & 2.  Dr.

15  Andreason currently works in an administrative capacity, and is authorized to review surgical

16  requests, and 602 appeal grievances prepared by inmates.  Id.  He does occasionally examine

17  inmate patients, but does not recall ever examining plaintiff relative to this action.  Id.

18       Defendant Bick is a medical doctor licensed with the State of California, having been a

19  licensed physician in California since August, 1994.  Bick Decl., ¶¶ 1 & 2.  Defendant Bick is

20  employed by the California Department of Corrections and Rehabilitation, also at the California

21  Medical Facility, as a Chief Medical Officer.  Id.  Dr. Bick currently works in an administrative

22  capacity, and is authorized to review non-surgical inmate appeal grievances.  Dr. Bick approves

23  on-site medical consults and oversees some of the medical staff at the CMF.  Id.  Defendant Bick

24  has not examined plaintiff relative to this dispute.  Id.

25       Plaintiff was diagnosed with renal transplant failure in 1999.  Defs.' Stmt. of Undisp.

26  Facts ("SUF"), 1.  Plaintiff's treatment involves dialysis three times a week.  SUF  2.  He has

1 received multiple outpatient consultations for concerns regarding his kidney and hematuria, as

2 well as X-rays and CT scans of his abdomen and pelvic area. *Id.*

3     On October 9, 2003, Dr. Albander requested a urology consult to rule out concerns of

4 malignancy, associated with plaintiff's hematuria concerns related to his transplanted kidney.

5 SUF 3.[2]  As a result of the urology consult, plaintiff received a cystoscopy examination on

6 March 18, 2004, at Queen of the Valley Hospital ("QVH"). SUF 4.  The results were negative

7 for tumors or stones, and yielded a normal cytology report. *Id.*  On April 21, 2004, plaintiff

8 meet with Dr. Vincenti of UCSF Medical Center ("UCSF") for a kidney transplant evaluation.

9 SUF 5.  His name was placed on the cadaver transplant waiting list. *Id.*

10     On August 19, 2004, plaintiff received a consult with Dr. Hildreth at QVH who

11 recommended a nephrectomy (kidney removal) of the transplanted kidney. SUF 7.  On August

12 25, 2004, plaintiff was scheduled to transfer to UCSF for the nephrectomy procedure, but was

13 sent back to CMF due to bed unavailability at UCSF. SUF 8.

14     On August 26, 2004, plaintiff was released to normal housing from the CMF medical

15 treatment center until UCSF could accept him. SUF 9.  On August 27, 2004, plaintiff was

16 admitted to UCSF for the nephrectomy procedure. *Id.*  On August 30, 2004, the nephrectomy

17 procedure was performed, and plaintiff's transplanted kidney was removed. SUF 10.  On June

18 15, 2005, plaintiff received a CT scan of his abdomen and pelvic area which revealed his liver

19 was within normal limits with no evidence of a liver mass. SUF 11.  The report noted that

20 plaintiff's previous concerns about a possible mass may have been related to the previous renal

21 transplant. *Id.*  Plaintiff's concerns involving his "spot on liver" were addressed as most likely

22 representing an area of focal "fatty infiltration," cautioning that early metastasis could not be

23 entirely excluded. SUF 12.

24

25     [2] On March 1, 2004, Defendant Khoury provided a second level appeal response partially granting the appeal request based on documentary evidence that plaintiff's medical concerns were being addressed. The portion of this request not granted was regarding any

26 treatment not recommended by plaintiff's treating physician.  Khoury Decl., ¶ 4; Exhibit J.

1   Plaintiff suffered no irreparable harm concerning the removal of his transplanted

2   kidney.  SUF 13.  Plaintiff was already on dialysis three times a week while awaiting the

3   approval of his kidney consultations and surgery.  *Id.*

4   **II.      Summary Judgment Standards**

5   Summary judgment pursuant to Fed. R. Civ. P. 56(a) avoids unnecessary trials in cases

6   with no disputed material facts.  *See Northwest Motorcycle Ass'n v. United States Dep't of*

7   *Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  At issue is "whether the evidence presents a

8   sufficient disagreement to require submission to a jury or whether it is so one-sided that one

9   party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

10  (1986).

11  Rule 56 serves to screen the latter cases from those which actually require resolution of genuine

12  disputes over facts material to the outcome of the case; e.g., issues that can only be determined

13  through presentation of testimony and evidence at trial such as credibility determinations of

14  conflicting testimony over dispositive facts.

15          In three recent cases, the Supreme Court, by clarifying what the
            non-moving party must do to withstand a motion for summary
16          judgment, has increased the utility of summary judgment. First, the
            Court has made clear that if the non-moving party will bear the
17          burden of proof at trial as to an element essential to its case, and
            that party fails to make a showing sufficient to establish a genuine
18          dispute of fact with respect to the existence of that element, then
            summary judgment is appropriate.  *See Celotex Corp. v. Catrett*,
19          477 U.S. 317 (1986).  Second, to withstand a motion for summary
            judgment, the non-moving party must show that there are "genuine
20          factual issues that properly can be resolved only by a finder of fact
            because they may reasonably be resolved in favor of either party."
21          *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis
            added).  Finally, if the factual context makes the non-moving
22          party's claim implausible, that party must come forward with more
            persuasive evidence than would otherwise be necessary to show
23          that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v.*
            *Zenith Radio Corp.*, 475 U.S. 574 (1986).  No longer can it be
24          argued that *any disagreement* about a material issue of fact
            precludes the use of summary judgment.

25

26  *California Arch. Bldg. Prod. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.), *cert.*

*denied*, 484 U.S. 1006 (1988) (parallel citations omitted) (emphasis added).  In short, there is no "genuine issue as to material fact," if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Grimes v. City and Country of San Francisco*, 951 F.2d 236, 239 (9th Cir. 1991) (quoting *Celotex*, 477 U.S. at 322).

Thus, to overcome summary judgement an opposing party must show a dispute that is both genuine, and involving a fact that makes a difference in the outcome.[3]  Two steps are necessary.  First, according to the substantive law, the court must determine what facts are material.  Second, in light of the appropriate standard of proof, the court must determine whether material factual disputes require resolution at trial.  *Id.,* at 248.

When the opposing party has the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim.  *See e.g., Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990).  The moving party need only point to matters which demonstrate the absence of a genuine material factual issue.  *See Celotex v. Cattret*, 477 U.S. 317, 323-24 (1986).

If the moving party meets its burden, the burden shifts to the opposing party to establish genuine material factual issues.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586.  The opposing party must demonstrate that the disputed facts are material, i.e., facts that might affect the outcome of the suit under the governing law, *see Anderson*, 477 U.S. at 248; *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that disputes are genuine, i.e., the parties' differing versions of the truth require resolution at trial, *see T.W. Elec.*, 809 F.2d at 631.  There can be no genuine issue as to any material fact where there is a complete failure of proof as to an essential element of the nonmoving party's case because all other facts

---

[3] On January 20, 2006, the court informed plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988).

1   are thereby rendered immaterial.  *Celotex*, 477 U.S. at 323.  The opposing party may not rest

2   upon the pleadings' mere allegations or denials, but must present evidence of specific disputed

3   facts.  *See Anderson*, 477 U.S. at 248.[4]  Conclusory statements cannot defeat a properly

4   supported summary judgment motion.  *See Scott v. Rosenberg*, 702 F.2d 1263, 1271-72 (9th Cir.

5   1983).

6          The court does not determine witness credibility.  It believes the opposing party's

7   evidence, and draws inferences most favorably for the opposing party.  *See Anderson*, 477 U.S.

8   at 249, 255.  Inferences, however, are not drawn out of "thin air," and the proponent must adduce

9   evidence of a factual predicate from which to draw inferences.  *American Int'l Group, Inc. v.*

10  *American Int'l Bank*, 926 F.2d 829, 836 (9th Cir.1991) (Kozinski, J., dissenting) (citing *Celotex*,

11  477 U.S. at 322).

12         If reasonable minds could differ on material facts at issue, summary judgment is

13  inappropriate.  *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  On the other

14  hand,"[w]here the record taken as a whole could not lead a rational trier of fact to find for the

15  nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation

16  omitted).  In that case, the court must grant summary judgment.

17         \\With these standards in mind, it is important to note that plaintiff bears the burden of

18  proof at trial over the issue raised on this motion, i.e., whether the defendants acted with

19  deliberate indifference to the plaintiff's safety.  Equally critical is that "deliberate indifference"

20  is an essential element of plaintiff's cause of action.  Therefore, to withstand defendant's motion,

21  plaintiff may not rest on the mere allegations or denials of his pleadings.  He must demonstrate a

22  genuine issue for trial, *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989), and he

23  must do so with evidence upon which a fair-minded jury "could return a verdict for [him] on the

24

25         [4] A verified complaint may be used as an affidavit in opposition to the motion.
    *Schroeder v McDonald*, 55 F. 3d 454, 460 (9th Cir. 1995); *McElyea v. Babbitt*, 833 F.2d 196,
26  197-98 (9th Cir. 1987) (per curiam).

1     evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.

2     **III.   Discussion**

3         Plaintiff claims that he received a kidney transplant in 1996, but as a result of his

4 inability to obtain needed medications from another prison facility in 1999, his transplanted

5 kidney ultimately failed.  He also alleges that defendants unreasonably delayed in arranging the

6 nephrectomy of his dead and infected liver.  Specifically, plaintiff claims that he was made to

7 wait for almost a year until he finally had the surgery to remove his transplanted kidney.  The

8 question presented here is whether he has presented adequate evidence of his allegations to

9 defeat summary judgement; i.e, whether his evidence is adequate for a reasonable jury to

10 concluded based on it that defendants were deliberately indifferent to his medical needs.

11         A determination of "deliberate indifference" involves an examination of two elements:

12 the seriousness of the prisoner's medical need and the nature of the defendant's response to that

13 need.  "Because society does not expect that prisoners will have unqualified access to health

14 care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if

15 those needs are 'serious.'" *Hudson v. MacMillian*, 503 U.S. 1, __, 112 S.Ct. 995, 1000.  A

16 "serious" medical need exists if the failure to treat a prisoner's condition could result in further

17 significant injury or the "unnecessary and wanton infliction of pain." *Gamble*, 429 U.S. at 104.

18 Either result is not the type of "routine discomfort [that] is 'part of the penalty that criminal

19 offenders pay for their offenses against society.' " *Hudson*, 503 U.S. at __, 112 S.Ct. at 1000

20 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  The existence of an injury that a

21 reasonable doctor or patient would find important and worthy of comment or treatment; the

22 presence of a medical condition that significantly affects an individual's daily activities; or the

23 existence of chronic and substantial pain are examples of indications that a prisoner has a

24 "serious" need for medical treatment.  *See, e.g., Wood v. Housewright,* 900 F.2d 1332, 1337-41

25 (9th Cir.1990) (citing cases); *Hunt v. Dental Dept.*, 865 F.2d 198, 200-01 (9th Cir.1989).

26 ////

Negligence is not enough for liability under the Eighth Amendment.  *Farmer*, 511 U.S. at 835-36 & n. 4.  An official's failure to alleviate a significant risk that he should have perceived but did not, . . . cannot under our cases be condemned as the infliction of punishment."  *Id*. at 838.  Instead, "the official's conduct must have been 'wanton,' which turns not upon its effect on the prisoner, but rather, upon the constraints facing the official."  *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (citing *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991)).  Prison officials violate their constitutional obligation only by "intentionally denying or delaying access to medical care."  *Estelle*, 429 U.S. at 104-05.

Prison officials violate the Eighth Amendment when they engage in "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  A prison official is deliberately indifferent when he knows of and disregards a risk of injury or harm that "is not one that today's society chooses to tolerate."  See *Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The official must "be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.

Deliberate indifference "may be manifested in two ways.  It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care."  *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).  When prison medical personnel act based on "a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law."  *Jackson v. McIntosh*, 90 F.3d 330, 331 (9th Cir. 1996).  Prison officials provide constitutionally inadequate care when they know that a particular course of treatment is ineffective, but they do not alter it in an attempt to improve treatment."  *See Jett v. Penner*, 439 F.3d 1091, 1097-1098 (9th Cir. 2006).  A medical need is serious if failure to treat the condition could cause further

significant injury or the unnecessary and wanton infliction of pain. *McGuckin v. Smith*, 974 F.2d
1050, 1059 (9th Cir. 1992).  Unnecessary continuation of pain may constitute the "harm"
necessary to establish an Eighth Amendment violation from delay in providing medical care.  *Id.*
at 1062.

It is undisputed that plaintiff's medical needs were serious.  However, plaintiff has failed
to adduce evidence that defendants were "intentionally denying or delaying access to medical
care." *Frost*, 152 F.3d at 1128 (citing *Wilson v. Seiter*, 501 U.S. at 302-03; *Estelle*, 429 U.S. at
104-05).  The facts demonstrate, on the contrary, that he received continuous medical care for his
condition.

A brief chronology illustrates the lack of support for the claim of indifference here.  On
October 9, 2003, Dr. Albander requested a urology consult for a cystoscopy (procedure that
checks the bladder and urethra) to rule out tumors, and hematuria (blood in urine) concerns
regarding plaintiff's complaints relating to his kidney.  On October 22, 2003, a CT Scan noted a
spot on the liver that could be fatty infiltration, but at the time could not exclude early
metastasis.  On November 5, 2003, defendant Andreasen approved a further evaluation for
plaintiff's kidney concerns.  Because defendants could not obtain an earlier date for the
consultant to come to CMF, on January 5, 2004, defendant Andreasen approved plaintiff for an
outpatient consult at Queen of the Valley Hospital (QVH).[5]  Plaintiff was seen on February 24,
2004, by Dr. Bird at QVH who recommended a cystoscopy evaluation of plaintiff's kidney.[6]
////

---

[5]  On December 7, 2003, Plaintiff had filed an inmate appeal ("602") concerning x-ray
reports revealing possible "malignancy", and on February 5, 2004, Defendant CMO Andreasen
partially granted plaintiff's request for further study concerning the spot on his liver.  Plaintiff
had already been referred to an Urologist by this time.

[6]  During this time, plaintiff also filed an inmate appeal and on March 1, 2004, the
Second Level Appeal response was signed by Defendant Dr. Khoury stating that plaintiff's
medical concerns were being addressed, and that his claims of malignancy had not yet been
clinically substantiated. This was Defendant Khoury's only involvement in the matter.

On March 18, 2004, the Cystoscopy recommended by Dr. Bird was performed at QVH, and the results were normal.  On April 21, 2004 plaintiff was seen by Dr. Vincenti of the University of California, San Francisco, regarding his kidney transplant and his name was placed on a donor list.  On July 8, 2004, plaintiff was approved by the Medical Authorization Review Committee ("MARC") for consideration of a transplant, and the request was forwarded to the Health Care Review Committee ("HCRC") of CDCR.

On July 9, 2004, plaintiff was seen by Dr. Gunnell regarding a CT guided biopsy at UCSF.  On July 19, 2004, defendant Dr. Andreasen approved a re-evaluation with transplant services at UCSF.

On August 19, 2004, a CT scan was done of plaintiff's abdominal and pelvic area, noting the 1 centimeter spot which the earlier report of October 22, 2003, had also noted.  At the time, it was not certain if the spot on the liver was a fatty infiltration or a mass, and the report recommended rechecking the area in six months.

On August 19, 2004, plaintiff was seen by Dr. Hildreth (QVH) who recommended a nephrectomy (kidney removal).  The August 20, 2004, CT scan revealed a renal vein infarction of the transplanted kidney and renal vein thrombosis, and the removal was discussed with plaintiff.  On August 24, 2004, plaintiff was scheduled to transfer to UCSF for the kidney removal, however, on August 25, 2004, he was sent back to CMF and held there until August 27, 2004, when a bed became available at UCSF and he was admitted for the nephrectomy.

The previously transplanted kidney was removed on August 30, 2004.  On June 15, 2005, an X-ray taken of plaintiff's liver revealed a normal liver, with no liver mass seen.  The report notes that the mass seen in the October 22, 2003, x-ray may have been related to the renal transplant.

As set forth above, plaintiff was seen and evaluated by several specialists at non-CDCR hospitals.  Eventually, after the consultations and diagnostic testing, and while continuing with dialysis, plaintiff's kidney was removed and the liver was found to be within normal limits when

1    it was re-evaluated after the kidney removal.  Plaintiff has failed to produce evidence that the

2    kidney should, or in fact could, have been removed sooner than it was.

3          Based on Dr. Andreason's and Dr. Bick's declarations and reviews of the medical

4    records, including the scans, x-rays, and other diagnostic studies, it was clear at the time that

5    plaintiff's complaints were not of an emergency or immediate nature, nor did he ever require

6    treatment that was not rendered in a timely fashion.  All the medical evidence shows that

7    plaintiff's kidney was removed after it was deemed necessary to do so, and there is no evidence

8    to support plaintiff's claim that defendants in any way unreasonably delayed the procedure or

9    caused him any harm.  Plaintiff has presented no evidence upon which a reasonable jury could

10   rely to find that the defendants were deliberately indifferent to his medical needs.

11         Accordingly, defendants' February 7, 2007, motion for summary judgement is

12   GRANTED.  The Clerk is directed to enter judgment in defendants' favor and close the case.

13   Dated:  February 29, 2008.

15                                   EDMUND F. BRENNAN
                                     UNITED STATES MAGISTRATE JUDGE